Good morning, Your Honor, and thank you for that. We're ready. If it pleases the court, Brian McComas on behalf of Cesar Aguirre, who is actually present today for the argument. Well, thank you for letting us know. And it is always an honor to be here, particularly in this case, some 12 years after the Occupy Oakland movements stopped. And the honor is not because we're The honor is because reasonable jurors could disagree over whether Mr. Aguirre was correctly denied state habeas corpus relief. And that is because this court has granted a certificate of appealability and kept the promise of habeas corpus alive. So we're going to just deal with the two issues granted in appealability, but I'm reversing the order today. And we'll be addressing the Strickland issue before the Brady issue during argument. And as a kind of ground foundation, all of this deals with penal code section 594. I'm aware that all of you have experience in the state court and probably have dealt with a trespass or a vandalism issue. You've given your research on us. We all, yes, we've all been there. Well, you're all esteemed, and we value that. And the elements we'll be looking at that matter in terms of our claims are about damage, the extent of damage, what was damaged, and when, and the value of that damage. And when we go about this, we recognize that an uninformed strategy for defense counsel is really no strategy at all. And it's really not good enough to say, hey, prosecutor, have you turned over everything? OK, I believe you, particularly when you can see inconsistencies in the evidence that has been turned over. And so for in this instance, Officer Tedesco discussed both making observations to a witness next to him, but also having things, calling out things on the radio. So what's your best argument against the California State Court's determination that the body cam videos supported rather than undermined Officer Tedesco's testimony? I would ask the court to look at Exhibit G, which is the final one of Zbar's videos from the parking lot up above. And what Tedesco says is, he's at the door. He doesn't say the man is at each of the windows. He says the man is at the door. And that is different than his testimony at trial. He also says right after that that the man is leaving. That's also different than his testimony at trial, where he said the man never left, kept eyes on him the entire time. And so I would look at Exhibit G. But my point being is that counsel had a duty to find Exhibit G before trial. And he should have done that based on Tedesco's testimony. I was making calls out on the radio. Well, if so, a catalog picks those up. And if you look at the catalog, that pretty much alters all of Officer Tedesco's catalog. Was the catalog available, not independently of through discovery? He could have independently subpoenaed the catalog, or he could have filed a motion. Didn't he conclude not to do so for strategic reasons? His strategic reasons were to avoid a grand political defense. But catalogs are not. They're computer automated. Well, just how they might be used. But go ahead. And it would be used because he could both call out the timeline of Officer Tedesco and also learn of things he needed to follow up on, like investigating the other incidents where the windows were broken. With respect to what you said earlier concerning the error, the Superior Court conducted a substantial hearing, correct? The Superior Court, yes. For four days? Yes, I was part of that. Many witnesses. And under the standards of review, in terms of evidence and balancing, isn't there substantial deference to what the Superior Court concluded, including, for example, what you described earlier about the claimed inconsistencies between testimony and videos? Typically, there would be, Your Honor. But if the Superior Court misstates the law under Brady, then this court doesn't have to defer and refer the court to the Superior Court's statements about the materiality standard under Brady, that I'm required to prove that a different verdict would have resulted. And we know that's not true. We know that Chief Justice, or former Chief Justice Kaczynski used to say, evidence could be sufficient, but Brady could still be violated. And the standard is a reasonable probability of undermining confidence in the verdict, not that I've proven he's actually innocent by any measure. And that's really where we're talking about the elements of the offense, why this matters. Because this evidence, the evidence that a reasonable attorney would have obtained, goes to the damages, when they were damaged, who damaged them. But it also calls into question the amount of damages. And if we were just dealing with one door instead of six windows, I think that's important, because that narrows the defense. And it calls into question pretty much the entirety of the prosecution's case, that one man can run along over 40 feet and break everything and have nothing happen, because it's so perfectly clear. And this officer can see everything. When all those videos show, it's the exact opposite. It's chaotic. What is the standard of review when reviewing a California state court's determination that there was no Brady violation? What's the standard of review? Well, yours, I mean, it's the AEDPA standards. Was it in a reasonable application of the law? I'm sorry, I didn't understand. No, I was going to say, under that AEDPA standard, when you take a step back and the state court decided, even if more evidence had been uncovered, you now have a second officer, Officer Zeebroth, that is also saying that he was a witness to Mr. Aguirre breaking the windows. And I understand you have some differences of opinion about the timeline of it. But at the end of the day, isn't that supportive of the conviction? It very well might be. There's a reasonable probability of undermining the confidence in the verdict. Doesn't require us to rule out all possibilities of guilt. But what I would ask is, is there still a reasonable possibility that he wasn't guilty? And if you look at Officer Zeebar's testimony, you can get there. Because not only does he say that. Well, OK, but we have to look at it through what the state court had a hearing and all of that. And if the state court didn't feel that there was a reasonable possibility of what, I find it hard to believe that the state court would have denied relief if the state court would have thought that your client was actually innocent or that it was undermined. If the state court looked at it differently than you're advocating, that doesn't necessarily mean that the state court was wrong, right? It doesn't necessarily. But of course, we're advocating that. And the reason why we're here is we've exhausted to this point where we are now arguing that the state court both unreasonably applied federal law and adjudicated these facts. So you also argue IAC, correct? Correct. And what's your best argument that trial counsel's choice to focus on Officer Tedesco's credibility was unreasonable? Of course, as we know, you have we have 20-20 hindsight. It failed, as Mr. Aguirre was convicted. But how do we evaluate whether it was nonetheless a reasonable choice at that time? Well, a reasonable choice between just saying something and actually doing it. Did he do any investigation to impeach Officer Tedesco besides take pictures at night on a different day from a different vantage point to try and show that there was foliage in the trees? That is not a reasonable effort of impeachment. A more reasonable effort of impeachment is subpoenaing catalogs, making an informal discovery request. And I'd ask, Your Honor, if you really wanted to see what the strategy appeared to be, EOR 488 and 489 are Mr. Kamen's motions in limine for discovery. This was the catch. This was the play. He's going to not ask for discovery and then file a motion that says, I want everything excluded that's material. Well, that's not doing your job as defense counsel, and that's not bringing the truth to ascertainment for the jury. And so that's where I'd say, if that was his strategy, it's not enough to say it. You must do it. You must actually file a 1054 request for discovery. You must actually investigate witnesses. Do you want to save any time for rebuttal? I do. I want to save two minutes, and so I'll just close. You're at two minutes, yeah. Well, then I will save a minute and a half, and I'll close with this. We are looking at the aggregate effect, and I'd ask for the court to look at Danny Garza's declaration for corroborating evidence, that there is a question as to when and the extent of damages of the windows. And the ultimate issue here is that the jury needed the truth to be brought to light by either the prosecution or the defense, and they were the ones who were robbed. And that's the reason we are here seeking habeas relief, saying the state court's decision has been unreasonable. Thank you. Thank you. Good morning. Good morning. May it please the court, Gregory Ott for respondent appellee. One point on the standard of review that was stated by the trial court at the hearing. The trial court did make a reference to basically the usual prejudice standard, which is more likely than not that you might get a different result. But then right after that, the court says, and it's also been stated, alternatively stated, that it undermines confidence in the verdict. And that's the Brady standard. So the habeas court did understand the standard that was applicable here. Mr. Ott, can I ask about this timeline question? I think the state court did seem to allude to the fact that there may have been some inconsistencies in the timeline in Officer Tesesco's testimony. But the court ultimately concluded that they were inconsequential. Explain to me why you think that that inconsistency would not have affected the outcome of the trial or caused it to have doubt. Well, I think the chief reason was the timeline was, inconsistencies in the timeline is relevant. But it's definitely collateral. And Officer Tesesco's testimony of trial was never very exact. He said he didn't wear a watch. He said when he wrote his report that he didn't reference the catalogs. Look at that for timing. And if you look at his testimony of trial, he's led off with, essentially, what were you on duty at 1 AM? And that's where it starts. So the focus of trial really wasn't on the timeline. It's a collateral issue. And yes, it's relevant to his perceptions. But that's overwhelmed by all the other things that come into play. With this evidence, the biggest one is the second witness, Officer Zebarth, who testifies basically to the very same thing. He sees Aguirre. Tesesco sees Aguirre. They discussed it at the time. They discussed him. You see this guy. And they're both pointing. So they're discussing that they're pointing to the same person. And then you'll hear, at least twice, descriptions over the radio where, if we're going to consider that, by the way, and I'll get to admissibility, that the guy who's sitting there at the fountain, I think it was third from the left or third from the right, wearing this and that, he's arrestable. He's the one who broke the windows. And there was some argument in the reply brief that, well, Officer Zebarth or Tedesco was shown the video and couldn't point him out there. But it's undisputed he's there. He was arrested sitting there. And that's not disputed. He was arrested sitting there right at the fountain where he'd been for some time. But I'm digressing a little bit. But why wasn't it a Brady violation for the state not to produce the body cam videos prior to trial? Although the state court subsequently held otherwise, but could the jury have found the videos undermined officers' Tedesco's testimony? Our position is no. In fact, if anything, the opposite, that it gave some context to the situation. They can see what these officers are dealing with. It showed things that, for example, weren't testified to at trial. For example, that the albacove was lit. The albacove had a light right above the windows that were broken out. So what was your reason for not discovering them? Well, if I recall correctly, the assistant district attorney at the hearing said, I wish we had turned these over. Her argument, of course, was that they didn't have to be because they weren't material. But she didn't know either, if I recall correctly, why they weren't. She was not the trial attorney. I mean, right off the bat, I think the trial, correct me if I'm wrong, but the trial suggested that Officer Tedesco was the only witness to the breaking of the windows by Aguirre. But the body cam videos would have revealed that there was, in fact, a second witness, a second officer as well. So it's putting out something that is actually not true. Why isn't that helpful to the defense in some way? I'm not sure if I understand the question. I think it's actually helpful to the prosecution. I think they could have, if they had put those out, maybe, I don't know if they weren't aware that there was a second witness or if they thought one witness was enough. But when you turn this over and you reveal this, you see we've got another witness. They're cross-corroborating. He's testifying to basically the same thing. And if you look at the whole picture, all of the- Well, I know it was a really long time ago. So is this when body cams were starting and not everyone knew that the officers had body cams? I'm sort of surprised that it seems like, you know, in this day and age, everyone would be clamoring about where are the body cams, right? Yes. Is this the dark ages or- I was alive in the dark ages, but- So was I. I don't recall if- At the hearing, at the evidentiary hearing, IAC was not fully explored. There was a question about his tactics on the cad logs, but it wasn't fully explored. And so I don't recall if he was asked, why didn't you ask for the body cam? Or if he said, I just didn't know they existed. Our position is on the cad logs is that those were available. We don't take that same position with the body cam because those weren't posted. But the cad logs were available and he was familiar with them. And I- Well, I mean, it seems as if he didn't ask for much of anything, any kind of discovery. And so I was going to ask you, how is that a trial strategy? Doesn't it seem as if he was just taking the prosecution's word that Tedesco was the only witness? And I'm not going to ask any. I'm having a little bit of a hard time understanding. I mean, I get the argument that we didn't want to make this some political theater, but what does that have to do with asking for government's evidence in discovery? I recognize that, Your Honor. His answer to the question about the cad logs, for example, doesn't quite make sense as the district court acknowledged, but found that, hey, you think it could still be reasonable under the circumstances. As to the cad logs, he was familiar with them and had used them before. It may well be that he knew the cad logs were virtually useless. They're multiple layers of hearsay, as they were in this case. And they might establish a timeline, but I don't know because that wasn't fully explored. Our position is the stronger argument and the easier route is just to look at prejudice on the IAC issue. And on that, we've got, looking at the new evidence, of course, as I said, we've got Zeebarth, who testifies to the same thing. We've got, excuse me a second, the glass shards on his clothing when he's arrested, the detail about how they identified him and how they were able to separate him. He separated himself by walking over the fountain and sitting there, but how they both were able to track, well, let me back up. Tedesco said that he was able to track him as he walked down the stairs and keep an eye on him. He didn't arrest him personally because he had a weapon. And my understanding is you don't approach people with a weapon. You have somebody else who doesn't have a weapon arrest him. That's what he said at the hearing. So, but nevertheless, he identified him and tracked him the whole time, as did Zeebarth. I think Zeebarth walking down the stairs didn't, may have lost sight of him a couple of points. But the, and also the very limited admissibility, that can't be ignored that the limited admissibility of these videos, the video audio rather, and the catalogs, the catalogs were admissible only that certain things were said at certain times, but not even for the substance of those things. Just the utterance, the fact that you have an utterance, they really didn't establish much. They didn't really strongly establish a timeline because you still can't take the substance of those statements as to what's going on. And they're also, a lot of them are vague. They're breaking the windows. A lot of windows were broken through these riots in different places.  But it, what was I going to say? Well, I guess it was, I think counsel, we discussed a little bit when counsel for petitioner was up there. If the state court, I mean, obviously it was a four-day hearing and listened to everyone. If this, even though it wasn't an actual innocence claim, if the state court thought that he was actually innocent, wouldn't that be incorporated in that you lost confidence in the verdict? Exactly. Yes, Your Honor. I think that's, I think that's very arguably part of that element, the way it's stated. Not necessarily that you would have gotten a different verdict, but that you got a fair trial. And the last thing I wanted to point out was as to the Garza declaration, that was put in in the district court in support of an actual innocence claim. Now, that was a not cognizable claim, but that was the only thing it was relevant to. It makes no sense to take a declaration from somebody long after the fact, something that wasn't withheld, and point to evidence and retroactively say it's material. It can't, it doesn't make sense for the declaration to go to materiality. It wasn't something that was withheld, and it wasn't something in the trial record. Same with IAC. There's no argument that trial counsel failed to find Mr. Garza and put on his testimony. So there's, it really isn't relevant to anything before this court. So your position is that Mr. Garza's declaration is not relevant for our review of the state court's denial of relief? Is that what you're saying? That's correct, as to either issue. Okay, your time's up. Unless my colleagues have questions. No, thank you. Okay. Thank you. Thank you. Thank you. You maybe want to respond to, I was going to ask you, Mr. Garza indicates that Mr. Aguirre was not aware of his presence at the demonstration on November 11, 2011, prior to March 2017. What relevance does Mr. Garza's declaration have to our review of the state court's denial of relief? Thank you, Your Honor. I would ask that it just be relevant to the idea that if there is Brady error, Strickland error that's considered as part of prejudice because it corroborates other evidence that was not discovered or was suppressed. I want to answer your question though, Your Honor. Mr. Kamen testified that it was his understanding they were beginning the practice of wearing body cameras. That's EOR 0918. But more importantly, he testified that if he got it, he should have got additional evidence because he would have been for the purpose of trying to convince the jury that Officer Tedesco couldn't or didn't see what he claimed to. So you can see here that he's claimed a strategy but did nothing to add to that or to substantiate his own strategy. And that's where the ineffectiveness comes into play. Your Honor, timing does matter, not only for perception, but because they claimed to have kept eyes on him the whole time, him being my client. And that was the, quote, evidence box during closing argument by the prosecutor. Evidence box included photographs of trees by the defense and a direct eyewitness statement that I kept eyes on him the whole time. And this is why those videos matter. Because there is a video of the chief ordering Tedesco and a Tango team to do a tactical arrest of a person sitting at the fountain. That person is not Mr. Aguirre. It makes no sense why you would do that, why you would bypass a chance to arrest this man if he's causing so much damage. And his weapon is supposedly a chair. He's not holding a chair while he's sitting on the ground. And at the end of the day, those glass shards are on him because he chose to stay when they told him to leave. And he did that as a conscientious objector. He decided to be arrested and he doesn't deserve the extra felony conviction for doing so. So I ask that you reverse the state court's decision and address my case. Thank you. Thank you both for your argument in this matter. It will stand submitted. Thank you, Mr. Ott and Mr. McConnell.
judges: CALLAHAN, SANCHEZ, Kronstadt